Good morning. Thank you. May it please the Court. My name is Lori Wallace and I represent Tamela Latta. And we are here because at Step 4 of the sequential evaluation process, the ALJ concluded that Ms. Latta had a residual functional capacity to perform a limited range of light work and that she could also then return to her past work as a sales clerk of women's apparel. And it's our contention that there is legal error that is contained within those conclusions as well as there are some that are not supported by substantial evidence. With regard to the conclusion that the claimant can perform a limited range of light work, the ALJ provides us with a list of the bases for that conclusion. He states specifically that he relied on the fact that Tammy lives alone, that she was only undergoing conservative medical treatment, that there were inconsistencies in the medical records regarding her pain, a functional capacity assessment that was performed, he was relying on some of that, and a report prepared by or a functional capacity, residual functional capacity performed by a DDS evaluator, which was a non-examining, non-treating physician. Well, he also found that your client's subjective pain testimony was not credible, in part because she was laughing after an exam in which she had been crying and had rated her pain a 9 out of 10. Why was that finding unreasonable on the part of the ALJ? I think what's significant about that is that if you look at the conclusions or the opinions of the physical therapist who performed that assessment, even in light of the activity that she saw of Tammy that day, the uncontrolled sobbing earlier in the assessment, having to kneel, having to lay down during the course of the assessment, in addition to this incident of laughing at the end of the assessment, it was still the therapist's conclusion that Tammy could not work more than four hours per day, that she was limited to a job that allowed her to sit, stand, and walk at various times during the course of the day. She'd be allowed to do that. She still identified limitations with regard to lifting, carrying, pushing, and pulling. So obviously the therapist, even in light of the activities that Tammy was engaged in and the emotions that she displayed during the course of that assessment, still felt that those limitations were appropriate based on her testing of Tammy. Assuming that is so, you indicated that the ALJ found that she could do her former work as a sales clerk. Is that correct? That was his conclusion. Well, wasn't there an ultimate conclusion that although she couldn't be a sales clerk, she could do other things? Well, that was not his conclusion. That was offered by the government on appeal. The ALJ only made the conclusion at step four that she could return to her prior work. He never went on to step five and made a determination that she could do other work. So it's only the government on appeal that's making that suggestion? That's correct. All right, thank you. Well, there seems to be a little tension, and I'm going to ask them about it, that I guess that the ALJ did say that she could work as a sales clerk in light of the fact that the ALJ's RFC concluded that Lotta needed to be able to alternate between sitting and standing, and the vocational expert testified that the sales clerk position would not allow her to sit. So what the ALJ said, she could go to her prior work, but then there was also the vocational expert that said she had to alternate, and she couldn't do that at a sales clerk position. So that's what you're saying, that's problematic? Not that she couldn't do something else. In light of the way the decision is written and the reliance on the fact that she could return to her prior work as a sales clerk, I don't believe there's substantial evidence to support that, because the evidence that is in the record, both medically and vocationally, is that she needs to be able to alternate sitting and standing, and that is not allowed for in the job. That's pursuant to the DOT, the BE's testimony, as well as Tammy's description of her job that is in the record. When she completed her application for benefits, she also indicated that she never sat. So she has to be able to stand. So we could send it back, and the ALJ could still say that she could work, but the sales clerk one, that she can't do that, according to everything in the evidence is what you're saying? If you returned it simply on that basis, and everything else were left standing in terms of the credibility determination and the assessment or residual functional capacity, then yes, there would be other jobs, I believe, that were identified. So I guess if, let's just say hypothetically, if we were to find that that was the only error, is that an error? What's the effect of that error on this particular case, or does Molina sort of wash that away? Well, if the residual functional capacity identified by the ALJ stands, then I believe it would be harmless error, if that were the only basis for returning the case to the ALJ. I believe there are grounds, though. I understand you're not conceding all the other issues. I'm not exacting that out of you, but I kind of want to just go down all of those avenues and see what your position is. Thank you. In terms of the determination of the residual functional capacity, I do believe that there was error, and I do believe that was harmless, or it was not harmless error in that circumstance. And basically the two grounds for that is, is the ALJ in this particular case threw out the entirety of the medical evidence. I mean, he did. That's the bottom line. He didn't take any of it into consideration. He rejected all of that. All he did was accept the opinion of the DDS evaluator and then make a credibility determination on the claimant, saying that because he doesn't have to believe her and the medical opinions were based on her subjective complaints, ergo he doesn't have to believe the medical opinions. He can throw them out. Well, let me just see. Between February and May of 2008, Dr. Winkle changed his mind and opined that Latta was disabled. In that intervening period, besides her self-reporting, what other clinical evidence did Dr. Winkle rely upon to support his change in opinion? There's quite a bit, and I appreciate the question. First of all, there's radiographic evidence that Tammy's had a prior fusion, a one-level fusion. She's also had a discectomy, which is evident on the radiographs, that she has degenerative joint disease in her back, that she has retrolithesis in her back and a disc bulge, and that she also has degenerative changes in her SI joints. There's also objective evidence in the form of muscle spasms, which are documented on almost every appointment with Dr. Winkle, as well as the physical therapist. There's also the finding of the trigger points by three different doctors, which is the criteria for diagnosing fibromyalgia, which Tammy has. So Dr. Hollis, Dr. VanBeloy, and Dr. Robbins all identified the trigger points sufficient to make the diagnosis of fibromyalgia. There's also a depressed left Achilles reflex that was identified by Dr. Hollis. There's also the observations of the medical providers. They weren't simply listening to Tammy saying, Oh, I have to lie down all the time. The medical records show that they actually observed it. Dr. Winkle would come into his exam room, and she'd be laying on the table. The pain counselor who Tammy went to wrote a letter to Social Security and summarized her records, and so it's in the records as well, where when Tammy first started to see her in the fall of 2007, she was laying down during the counseling sessions. Then she was sitting up and laying down. Then she was able to sit up for most of them, and the records show that there was a period of improvement in Tammy's condition. And then it worsened again, and she was again laying down. So there's that evidence. It's also in the physical therapy records, where the therapist observes the muscle spasms, observes Tammy having difficulty doing the exercises. So there are their own observations and radiographic evidence that these doctors are also relying on. They're not simply taking Tammy at her word. There's also the consistency in the diagnoses across the different medical providers. Over time, we had three different doctors diagnose the fibromyalgia. We've had the doctors all diagnose the low back pain, the disc bulging, the sciatic pain, and the SI joint pain. We also have the duration of treatment from these doctors. Dr. Winkle was treating Tammy for over 22 months, seeing her almost monthly during that period of time, or talking to her on the phone. So he has the benefit of that time period in which he's seen her go from having a lot of trouble immediately after the accident to a period of improvement, where he was going to release her, but only to part-time work, to where she worsened again, which then goes into a period where she improves again. And he again talks about releasing her back to work. So he's not a doctor that is simply accepting what she is saying. He is challenging her on the issue of returning to work and considering it and authorizing it until something happens to change that opinion. And that's reflected again in the physical therapy notes. It's reflected in the pain counseling records. They all have the benefit of longevity. She saw the counselor for over nine months. She saw the physical therapist for a number of months at a time over the course of two years. She saw the chiropractor for a year. He also expressed the opinion that whenever she increased her activities, it would re-aggravate her condition. She saw Dr. Hollis and Dr. VanBeloy on only one occasion, but she had seen both of them three and four years prior. And the significance of that is that that period of time she was working, doing light to medium-duty work. She was in there seeing them, so she obviously had some pain complaints, but she was still working and active at the time. And then they see her following this accident, and she's a completely different person. Dr. VanBeloy comments on the fact that Tammy can't sit throughout the entire examination. So, again, it's an observation from the doctor. Do you want to reserve any time for rebuttal? I was going to go down to two. Okay. Thank you very much. So there are these direct observations that are never commented on by the ALJ. None of this evidence was commented on by the ALJ. He looked to their conclusions only. As far as the other medical sources, the pain counselor, the chiropractor, the physical therapist, all he comments on are the conclusions, but what he ignores are the facts that are contained within their records of these long periods of time where they are treating Tammy. And so it's not ‑‑ it was error for the judge to not comment on any of those, and that goes to the Molina issue, because the facts within those records are not cumulative. Many of those facts are the direct observations of these providers, and those were not recognized and reviewed by the ALJ. They were simply not commented on and discarded. And so in the case ‑‑ I don't know how to say this case, but it's maybe Gwin. The evidence, it says, the evidence contained in records of other sources reflecting the claimant's symptoms, the symptoms and the manner in which an impairment affects the claimant's ability to work, is competent evidence and cannot be disregarded without comment. So it's not just the opinions, which the ALJ rejected because they were from nonmedical sources, but he never got to the issue of the symptoms that they document in her records, and that is an area where the ALJ should be required to review those and comment on them, because they are ‑‑ they're not cumulative evidence. They go to the symptoms that the claimant has and the manner in which those symptoms affect her level of functioning. So I'll reserve the rest. All right, you have 45 seconds left. Good morning, Your Honors. Good morning. My name is Michael Howard, representing the Commissioner in the case of Lada v. Astru. Your Honors, plaintiff referred to a car accident, and there are several things in her argument today that I'd like to touch on and raise in the briefing that I'd like to touch on, but plaintiff referred to a car accident as being the onset of her disability in August 2006. I think it's important to note that this car accident was a very low‑speed car accident where her car was parked in a parking lot, stopped, and another car backed into the front, and there was no damage to either vehicle, and plaintiff did not seek treatment for two days, and this is the alleged onset of disability when her fibromyalgia allegedly became debilitating. And it's important to note also that this is not a case, as plaintiff claimed today, where the ALJ threw out all the medical evidence from the treating physicians. The treating physician gave varying opinions about whether she could work and stating on two occasions that she could return to work in some form, and the ALJ reasonably gave weight to the statements that she could return to work when viewed in light of other evidence of record, such as plaintiff laughing after an examination when she had been loudly sobbing and claiming nine out of ten pain, and after leaving that examination laughing, walking around, reading a book, and talking to her friend on the phone, and many other items of evidence undermining her credibility. And in light of this record, it was very reasonable for the ALJ to find that she could return to a limited form of work, which was the sales clerk job as is generally performed. But that seems like there's a little problem with that because did the ALJ err in determining that Lotta could return to work as a sales clerk in light of the fact that the ALJ's RFC concluded that Lotta needed to be able to alternate between sitting and standing, and the vocational expert testified that the sales clerk position would not allow her to sit? No, Your Honor, there was no error. As explained in our briefing, if we read the vocational expert testimony in total over pages 69 and 70 of the record, and we just take a plain, simple reading of that testimony, the ALJ questioned the expert about an exhibit in the record, Exhibit 8F, and that was a report of the state agency doctor, Dr. Schofield. And Dr. Schofield gave this requirement for sitting and standing, alternating sitting and standing, but he specifically explained that in this case, the sit-stand requirement was qualified. It only meant that the plaintiff needed to sit during normal work breaks. So when the ALJ specifically questioned the vocational expert about Exhibit 8F and the expert answered that, yes, a person with these limitations could perform the sales clerk job and then later stated that the job would not allow sitting, I think it's entirely reasonable under just taking a plain reading of that testimony that the sitting would be on the work breaks. All right. It takes a little inference, though, right? I mean, there's – I'm sorry. I didn't want to interrupt, Your Honor. Well, it just takes a little inference there. It's a little confusing, a little convoluted, and you have to kind of pull out of there. I would agree with Your Honor that it is something of an inference, but taking the most plain reading possible of that testimony and essentially taking the vocational expert at his word when he states that he had reviewed Exhibit 8F and was responding to questions based on that doctor's report, if we take him at his word, then that is true. Well, Dr. Schoenfeld, though, my understanding is he explained that Lotta must be able to change posture in positions, right? And does that mean that Lotta does not need to be able to sit during the day, or what is that? Does it mean she changes her posture and positions when she's standing, or what does that mean? As I recall, Your Honor, I think it was qualified in terms of sitting during normal work breaks. I'm not certain if there was an additional – I don't believe that there was any additional requirement to change her posture beyond sitting and standing, if I'm answering Your Honor's question. Okay. Well, just from a common-sense standpoint, doesn't the vocational expert's testimony that a sales clerk, during a normal day, doesn't get to sit and stand? The sales clerk is walking around. I've never seen any sales clerk going over and sitting either. So it seems to me that what the vocational expert said was correct, that it was alternating the other postures, but not sitting. Yes, Your Honor, and that's why we submit that the most fair reading of that testimony would be that the sitting would be limited to work breaks when the employees – Limited to what?  Limited to work breaks. Work breaks. Lunch break and things of that nature. Why would that be involved at all? You know, lunch breaks, you can do whatever you want, but I think what the vocational expert is really talking about is what you have to do on the job. Certainly, Your Honor, and that's our reading of that phrase when the expert says that the job would not allow sitting. But he was earlier referring to the report of the state agency physician who said that the sit-stand requirement could be accommodated by sitting during work breaks, and I believe that's where that physician comes from. And in any event, Your Honors, if there is error at Step 4, as we laid out in our brief, it would be harmless error given the clear testimony at Step 5, although there was – and the Commissioner is not suggesting that there was a Step 5 finding by the ALJ. The testimony at Step 5 is very clear that a person with these limitations, this residual functional capacity, and these vocational factors would be able to perform any of tens of thousands of jobs in the national economy identified by the vocational expert. So any error – if there's only error at Step 4, it would be harmless error. Is that before Molina or only after Molina? That is – this argument would apply regardless of Molina. In fact, it is simply, as directed by the Supreme Court's decision a year or two ago in the Shinseki case, it is simply following the direction that the court should ask the harmless error question directly, and I'm closely paraphrasing the Shinseki case there, and evaluate whether there is, in fact, any prejudice from an error, and is not supplying a finding for the ALJ if the court were to find error at Step 4, which we do not concede. It is simply evaluating whether that error is harmful and prejudicial to the ultimate outcome of the case, which is well-recognized in past decisions, such as the Carmichael case cited in the briefing. In this case, the ultimate question is whether the ALJ's decision remains valid. I would like to touch on a few other issues in my time today. The plaintiff in her argument today stated that the February 2000 opinion of Dr. Winkle, when he changed his opinion from saying plaintiff could work to stating that she could not work, plaintiff portrayed that as being supported by objective evidence and referred to, for instance, I think it was an x-ray or some other imaging of a prior surgery. These findings had been in place for years. This objective evidence did not demonstrate a worsening in February 2008 that would support a change in the doctor's opinion from you can work to you cannot work. Are you referring to the radiographic test? Yes, Your Honor. That it was not new? Yes, Your Honor. I believe that that laminectomy back surgery the plaintiff had undergone was from a horse-riding-related injury years prior to the alleged onset of disability. And other findings that plaintiff has referred to today, such as back spasms or tenderness on examination or trigger points, those were consistent, not even consistent, but they were present at different times throughout the relevant period. There was not a sudden objective worsening. If we look actually at a letter from Dr. Winkle in May 2008 at page 340 of the record, and we look at what the doctor is citing to explain when he writes to the Montana State Fund explaining why he believes plaintiff is disabled, he states her fibromyalgia has gotten worse. He doesn't list a sudden acute injury to the lower back or a change in radiographic imaging or anything of that nature. It's her fibromyalgia has gotten worse. She came essentially, and this is the part where I'm departing from paraphrasing the letter, essentially plaintiff has come to me and said, I couldn't return to work and my pain is acting up. And the doctor relied on that. And that is what happened on both occasions when Dr. Winkle changed his opinion from plaintiff can work to she cannot work. He relied on her subjective statements. That's what the ALJ does conclusory statements. Is that right on the part of Dr. Winkle? I believe the ALJ may have referred to those as conclusory, but he also stated that they relied unduly on her subjective statements. So if he didn't believe, so the ALJ didn't believe the petitioner, and if the doctor relied on what the petitioner said, the ALJ wasn't giving much weight to that. That's correct, Your Honor. That is a big primary reason in this case for rejecting the treating physician opinions which indicate she could not work, and giving weight instead to the ones that say she could. The ALJ also gave weight to a state agency doctor who reviewed all the evidence and stated that plaintiff could perform a modified range of light work, and that giving weight to that state agency doctor was an additional reason supporting the decision on that point. But that's the problem with just the examining and non-treating one, is that they are only looking through the records. They never see the person. And I was interested that the ALJ was placing great stress on the fact that Dr. Schofield was the one that he was really relying on, and that that's what he thought really was the important thing in the case. Well, Your Honor, I certainly would acknowledge that normally treating physician opinions deserve greater weight, but certainly in this case there were a number of reasons to depart from that general presumption about the weight of physician opinions and give more weight instead to the state agency doctor. And the ALJ did not rely solely on the state agency doctor. Yet plaintiff's briefing cites the cases of the Ninth Circuit, such as Oren and Reddick, which deal with situations where the ALJ relies solely on the state agency doctor. And those cases and those arguments that plaintiff makes in her briefing are in a posit. The ALJ relied on a number of other reasons in this case and explained that the treating physician relied unduly on her subjective complaints. On the issue of Step 4, I'd like to briefly note that in plaintiff's reply brief, she has raised several new arguments before the court regarding Step 4. These new arguments, there's a few of them. They're at pages 16 through 19 of her reply brief. She did not raise them before the district court, and she did not raise them specifically and distinctly in her opening brief. And for these reasons, we'd argue that plaintiff has waived these additional Step 4 arguments. On the issue of other source opinions and these opinions from the physical therapist and the chiropractor and the counselor, plaintiff is essentially advocating for a much higher burden on the ALJ's written discussion than is supported by agency rulings or Ninth Circuit case law. This case is different from the preceding Social Security case, which the court was just hearing. In this case, the ALJ addressed each and every other source or lay witness opinion at issue and gave reasons to reject them. And in plaintiff's reply brief, it appears that she even gives up any attempt to challenge the ALJ's reasons for rejecting those other source opinions. What plaintiff is advocating, essentially, is for a legal rule that the ALJ, as a matter of law, errs in not rejecting and addressing every statement or observation in the treatment notes of a chiropractor or physical therapist when that is possibly inconsistent with the ALJ's findings. And there is no authority supporting that proposition. That would be a very stringent and illogical burden to place on the administrative process. The commissioners supplied the Molina decision in a 28-J letter, and the Molina decision is relevant here because it cites to an agency ruling, SSR 063P, which explains, and the court cites this ruling with approval, this ruling explains that there's a distinction between what the ALJ must consider and what the ALJ must discuss. And the ALJ is supposed to consider all the evidence of record, and there's every indication that the ALJ did this in this case. He even cited to some of the observations from these other source treatment notes. He just simply did not cite to every single observation of these other source treatment notes. And then the ALJ, in the written discussion, explained his rejection of their opinions, which was entirely consistent with the agency ruling 063P, which specifically refers to rejecting other source opinions. I don't think that the fact that the Ninth Circuit has used the phrase that the ALJ must address lay witness testimony, quote, lay testimony, is creating any sort of rule that the ALJ must then go through all treatment notes and address every possible observation that is inconsistent with the decision. That would be inventing an additional requirement if we were to read it in that way. But under Molina, even if it were to be error, it would be harmless. Is that right? I would certainly agree, Your Honor. Molina provides a great deal of support for that further argument. I see that my time has expired. I would ask that the Court affirm the commissioner. Thank you for your argument. You have 45 seconds. What this comes down to is obviously the credibility of the claimant. And I think what's important here is even the DDS evaluator, Dr. Schroeder, said the claimant's symptoms are consistent with the medical evidence. That's what he said. So there is no evidence in the record that the claimant's symptoms are not consistent with the medical evidence that's there as to what is going on in her back and her hips and joints. So with that acknowledgment that there is that credibility to the claimant's symptom testimony, it was incumbent upon the ALJ to visit those points in the record where those symptoms are discussed, including the records of the other sources as well as the treating physicians. All right. Thank you for your argument. This matter will stand submitted. The last matter on calendar is United States Aviation Underwriters, Inc. v. Nabtesco Corporation, 11-35440. That matter has been submitted on the briefs and will be submitted as of this date. This Court is in recess until tomorrow at 9 a.m. All rise.
judges: Hug, Nelson, Callahan